IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **HUMAN RIGHTS DEFENSE CENTER,**<br><br>         **Plaintiff,**<br><br>         v.<br><br>**JOHNSON COUNTY, KANSAS, BOARD OF COMMISSIONERS, et al.,**<br><br>         **Defendants.** | Case No. 2:20-cv-02447-HLT-KGG |

## MEMORANDUM AND ORDER

Plaintiff Human Rights Defense Center ("HRDC"), a publisher of publications aimed at prisoners, sues the Johnson County Board of Commissioners, Sheriff Calvin Hayden, and several unidentified individuals (collectively referred to here as "Johnson County") over the mail policy at Johnson County jail facilities. HRDC alleges the mail policy violates its rights to free speech and due process under the First and Fourteenth Amendments. Currently before the Court is HRDC's motion for a preliminary injunction (Doc. 5), in which it requests an injunction prohibiting Johnson County from censoring HRDC's mail and denying it due process. Because HRDC has not demonstrated a substantial likelihood of success, the Court denies the motion.

**I.  BACKGROUND**[1]

  **A.    HRDC's Mission and Publications**

HRDC is a non-profit organization dedicated to educating "incarcerated persons and the public about the destructive nature of racism, sexism, and the economic and social costs of prisons

---

[1] The following facts are taken from the evidence submitted with the preliminary-injunction briefing.

to society." Doc. 6 at 1. To achieve this end, HRDC engages in advocacy and litigation, and publishes and distributes books, magazines, and other information. *Id.*

HRDC publishes two monthly magazines. *Prison Legal News* addresses matters affecting incarcerated individuals. The other, *Criminal Legal News*, focuses on court rulings and other criminal-justice news. *Id.* at 2. Both magazines are intended to provide prisoners with timely and in-depth information that could not be communicated to them otherwise. *Id.*

HRDC also publishes and distributes soft-cover books on subjects of interest to prisoners. Two of those books relevant to this case are *Prisoners' Guerilla Handbook: A Guide to Correspondence Programs in the United States and Canada*, which provides information about enrolling in higher education or vocational programs, and *Protecting Your Health and Safety*, which describes the rights, protections, and legal remedies available to prisoners. *Id.* at 2-3.

HRDC also sends brochure packets, subscription order forms, copies of judicial opinions, and letters to prisoners. *Id.* at 3. HRDC delivers these materials through the U.S. Postal Service. Each is addressed to a specific person and postage is fully paid. *Id.* Since 1990, HRDC has sent thousands of magazines and books through the mail, and has thousands of subscribers, including incarcerated individuals, attorneys, journalists, libraries, judges, and the general public. *Id.* It currently sends its publications to more than 3,000 correctional facilities across the United States. *Id.* at 4. Other than its mailed publications, there is no other feasible way for HRDC to communicate its message to prisoners. *Id.* at 9. HRDC frequently challenges mail policies at jails and prisons, and therefore has become very familiar with those policies and practices. *Id.*

### B.     Johnson County's Detention Facility Mail Policies

Johnson County operates the New Century Adult Detention Center in New Century, Kansas, and a central booking facility in Olathe, Kansas. Doc. 11 at 2. The facilities receive

approximately seven to thirteen totes of mail each week. The totes are 13x18x12 inches. The exact number of individual mail items received is not tracked. *Id.* All inmate mail is first received and x-rayed at the county courthouse before it is processed and distributed. *Id.* The mail is processed by civilian staff who, among other duties, are trained as mail clerks. Each day, one staff member is assigned exclusively as the mail clerk for the day. On days with a large amount of mail, a second staff member will assist. When not working as mail clerks, staff members have other duties elsewhere in the facilities. *Id.*

A summary of rules, restrictions, and other information about mail sent to the facilities is posted on Johnson County's website. *Id.* at 3. Two policies are relevant here. Although it is not clear when these policies went into effect, the policies appear to have begun impacting HRDC in July 2020.

### 1. Sticker/Label Policy

The first policy at issue is the sticker/label policy. Johnson County's website reflects that non-privileged mail may be inspected for prohibited content or restricted materials and that no "plastic/wrappings, labels or stickers" are permitted on letters or postcards. Doc. 6 at 5.

The purpose of the sticker/label policy is to ensure that no contraband is smuggled into the facilities by a label or sticker, which has happened at other jail facilities. Doc. 11 at 4; *see also* Doc. 11-2. Stamps are the exception because they are necessary for mail delivery. Doc. 11 at 3. Stamps are cut off envelopes before mail is delivered to prisoners. *Id.* But removing other stickers or labels would take additional staff time and would also sometimes require the information from a removed label to be handwritten on the envelope by staff to ensure accurate delivery and tracking. *Id.* at 4.

3

If mail is rejected because of stickers or labels on the envelope, it is not opened and is returned via the U.S. Postal Service. *Id.* at 3. Inmates receive an electronic notice of rejected mail, and the sender is notified of a rejection under the sticker/label policy by a red stamp on the returned mail stating "No Labels, Stickers, Etc." *Id.* at 4.

### 2. Package Pre-Approval Policy

The second policy at issue is the package pre-approval policy. Johnson County's website states that packages will not be accepted without prior approval. Doc. 6 at 6. A package is any item requiring more postage than a first-class stamp. *Id.* Packages are generally a higher security concern because they are larger and have more places to hide contraband. Doc. 11 at 5. An inmate must seek pre-approval through an electronic kiosk system and must itemize all the package's contents. *Id.* An Inmate Services Supervisor can then approve the package. *Id.* Limiting packages to pre-approved items simplifies the mail clerk's job because it prevents problematic items from being sent in the first place and, upon arrival, the contents need only be verified and inspected. *Id.* Otherwise, the mail clerk will have to spend time reviewing and inspecting unsolicited items sent to inmates, which the recipient may not even want. *Id.*

When a package that has not been preapproved arrives, the mail clerk does not open the package. It is stamped "Return to Sender Unauthorized Package Reason: _____" and returned to the sender via the U.S. Postal Service. The mail clerk sometimes writes "not approved" in the blank. *Id.*

Johnson County estimates that requiring staff to remove labels or stickers, or to inspect unapproved packages, would require an additional 40-60 staff hours a month. *Id.* at 7. Requiring mail clerks to generate a letter to the sender of each mail item rejected under the sticker/label

4

policy or package pre-approval policy would require an additional 60-80 hours a month. *Id.* at 7-8. These procedures would cost Johnson County over $40,000 in additional salary each year. *Id.*

### C.   HRDC Mail Rejected by Johnson County

Since July 2020, Johnson County has rejected 58 items sent by HRDC:

- ten copies of *Prison Legal News*;
- ten copies of *Criminal Legal News*;
- ten copies of *Protecting Your Health and Safety*;
- ten copies of *Prisoners' Guerilla Handbook*;
- ten brochure packets;
- one court ruling;[2] and
- seven follow-up letters.

Doc. 6 at 6-7. These items were returned to HRDC via the U.S. Postal Service and were marked with one or more of the following stamps: "Refused," "Not Approved," "Return to Sender Unauthorized Package Reason: _____," "Return to Sender Unauthorized Package Reason: Not Approved," "Return to Sender Unauthorized Package Does Not Comply With Facility Mail Policy," and "No Labels, Stickers, Etc." *Id.* at 7. HRDC was not given an opportunity to appeal these rejections. *Id.* It is unclear whether Johnson County has rejected any of HRDC's other mail, other than these 58 items.

The Johnson County official who oversees the mailroom has reviewed the materials submitted as exhibits to HRDC's preliminary-injunction motion and indicated that they were rejected because they violated either the sticker/label policy or the package pre-approval policy, based on the stamps on the returned mail. Doc. 11 at 7. Had the materials been pre-approved or not sent in packages, or not had stickers or labels on them, they would not have been rejected. *Id.*

---

[2] Although legal or privileged mail is often subjected to different standards, neither party argues that this court ruling falls into this category.

5

Since at least September 24, 2020, HRDC has sent copies of *Prison Legal News* in a manner that complies with both the sticker/label policy and the package pre-approval policy. Some of the inmates who were sent copies have added it to their subscription list and have received their copies of *Prison Legal News*. Others have declined the subscription. *Id.* at 6-7.

### D.     Lawsuit and Preliminary-Injunction Motion

HRDC filed this lawsuit under 42 U.S.C. § 1983 alleging violation of its First Amendment right to free speech and communication, and violation of its Fourteenth Amendment right to due process. Doc. 1. It also filed a motion for preliminary injunction seeking an order prohibiting Johnson County from "(1) continuing to arbitrarily and illegally censor the Plaintiff's written materials sent via U.S. Mail to incarcerated persons at the Jail; and (2) continuing to deny Plaintiff its right to Due Process of the Law, by failing to provide HRDC with adequate notice of the reasons for rejecting its correspondence and a meaningful and expeditious opportunity to appeal any such rejections." Doc. 5 at 2-3.

## II.     STANDARD

A party seeking a preliminary injunction must show that there is a substantial likelihood of success on the merits of the underlying claim, irreparable harm will occur unless the injunction is issued, the threatened injury outweighs any potential harm that the injunction may cause to the opposing party, and the injunction, if issued, will not adversely affect the public interest. *New Mexico Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1246 (10th Cir. 2017). A preliminary injunction is "an extraordinary remedy." *Id.* at 1245-46 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Whether to issue an injunction is within the discretion of the court. *See Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).

Courts disfavor three types of preliminary injunctions: (1) those that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford all the relief that could be awarded after a full trial on the merits. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc). The Court finds that the requested injunction would alter the status quo or is otherwise mandatory in nature. The requested injunction would enjoin Johnson County from enforcing its current mail policy and would require acceptance HRDC's mail even if it does not comply with the policy. Accordingly, because it is seeking a disfavored injunction, HRDC must make a "strong showing" of the injunction factors, particularly on the likelihood-of-success and balance-of-the-harms factors. *Id.* at 976.

## III. ANALYSIS

### A. Likelihood of Success on the Merits

To succeed on its motion for preliminary injunction, HRDC must make a strong showing that it has a substantial likelihood of success on the merits of its First Amendment and Due Process claims. The merits of each claim are discussed in turn.

#### 1. First Amendment Claim

People in prison generally retain their constitutional rights to the extent the right does not conflict with the "legitimate penological objectives of the prison." *Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004). This includes the First Amendment right to receive information while in prison. *Id.* The same standard applies to people or organizations outside the prison who are attempting to communicate with prisoners. *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989); *Simpson v. Cnty. of Cape Girardeau, Mo.*, 879 F.3d 273, 278 n.2 (8th Cir. 2018). Accordingly, a prison regulation that impinges on such a constitutional right is invalid unless it is reasonably related to a legitimate penological interest. *Jacklovich*, 392 F.3d at 426.

Courts employ the four-factor test developed by the Supreme Court in *Turner v. Safley* to determine whether a regulation is reasonably related to a legitimate penological interest. *See Jacklovich*, 392 F.3d at 426. That test asks (1) whether there is a valid and rational connection between the regulation and a legitimate and neutral governmental interest; (2) whether the challenging party has alternative means of exercising the constitutional right; (3) whether and to what extent accommodating the right would impact guards, inmates, and prison resources; and (4) whether there is an easy and ready alternative for the regulation that has de minimis impact on the penological interest. *Turner v. Safley*, 482 U.S. 78, 89-91 (1987); *Jacklovich*, 392 F.3d at 426.

Although the standard is not toothless, courts generally give prison officials considerable deference. *See Thornburgh*, 490 U.S. 407-08; *Jacklovich*, 392 F.3d at 426; *see also Prison Legal News v. Sec'y, Fla. Dep't of Corr.*, 890 F.3d 954, 965 (11th Cir. 2018) (noting that a court should not act "as a super-warden to second-guess the decisions of the real wardens"). This is particularly true where a state prison is involved. *Turner*, 482 U.S. at 85. Ultimately, the burden is on the party challenging the regulation to prove it is unconstitutional, and not on prison officials to prove it is constitutional. *Wirsching v. Colorado*, 360 F.3d 1191, 1200 (10th Cir. 2004).

In evaluating the likelihood of success on the merits, the Court will apply the *Turner* standard to the sticker/label policy and the package pre-approval policy.[3]

---

[3] An initial difficulty with HRDC's motion is that it only obliquely challenges Johnson County's mail policy. It either refers to policies in general, or Johnson County's "policy of censoring HRDC's mail and publications," Doc. 5 at 11, which is not an actual policy. HRDC suggests it does not know why its mail was rejected, though it concedes that the mail rejected was marked with one or more of the following notations: "Refused," "Not Approved," "Unauthorized Package," "Unauthorized Package Reason: Not Approved," "Unauthorized Package Does Not Comply With Facility Mail Policy," and "No Labels, Stickers, Etc." *See id.*; Doc. 6 at 7. Thus, it appears that the returned mail was rejected because it either had labels or stickers or was an unauthorized package. Neither party suggests that the mail was rejected for any other reason or under any other mail policy provision. *See* Doc. 10 at 5; Doc. 14 at 3. Accordingly, the Court focuses its analysis on those policies.

### a. Sticker/Label Policy

As an initial matter, other courts that have upheld prison bans on correspondence containing labels or stickers. *See Smith v. Maschner*, 899 F.2d 940, 944 (10th Cir. 1990); *Gee v. Pacheco*, 627 F.3d 1178, 1188 (10th Cir. 2010) (citing *Smith* and noting that "prison officials may regulate the content of incoming mail and properly ban items such as stickers"); *Whitington v. Moschetti*, 423 F. App'x 767, 772 (10th Cir. 2011) ("[W]e have held that an inmate who challenged a policy of returning correspondence with stickers to the sender had not shown the violation of any protected right."); *Sikorski v. Whorton*, 631 F. Supp. 2d 1327, 1348 (D. Nev. 2009) (upholding under *Turner* practice of returning mail unopened when it contains tape or stickers); *Jeffries v. Snake River Corr.*, 2008 WL 3200802, at *4 (D. Or. 2008) (upholding regulation prohibiting stickers and adhesives on incoming mail under the *Turner* factors). Applying the *Turner* factors, the Court agrees with these decisions that the sticker/label policy is reasonably related to a legitimate penological interest.

The first *Turner* factors asks whether there is a rational connection between a prison regulation and a legitimate and neutral government interest. *Turner*, 482 U.S. at 89-90. Regulations that draw distinctions based solely on their implications for safety are neutral. *Jones v. Salt Lake Cnty.*, 503 F.3d 1147, 1153 (10th Cir. 2007). Johnson County asserts that the sticker/label policy serves the interest of facility safety because contraband can be smuggled into prisons under labels and stickers. Doc. 10 at 7-9; Doc. 11 at 4. The Court has little trouble concluding that the ban on labels and stickers is rationally related to the legitimate penal interest in preventing contraband from entering the facilities.

HRDC argues that the sticker/label policy does not serve any such interest when applied to publishers and distributors because those entities are unlikely to use stickers or labels to conceal

9

contraband. Doc. 5 at 11; Doc. 14 at 3.[4] But as Johnson County counters, allowing such an exception would be problematic because jail officials are not necessarily trained to know which senders are reliable publishers, and allowing such an exception would invite those wishing to send contraband to masquerade as publishers. *See* Doc. 10 at 10. Because there is a rational relationship between the policies and a legitimate and neutral government interest, this factor weighs in favor of Johnson County.

The second *Turner* factor asks whether HRDC has alternative means of exercising its First Amendment right. *Turner*, 482 U.S. at 90. If other avenues of communication remain available, courts should be "particularly conscious" of the judicial deference typically showed to prison administrators. *Jones*, 503 F.3d at 1153. HRDC argues it has no alternative means of effectively communicating with prisoners except through its print communications, and under Johnson County's mail policy, it is "left with no practical way to reach its intended audience." Doc. 5 at 13. But under the sticker/label policy, HRDC is not prohibited from sending publications—it is only prohibited from sending publications with stickers or labels. Its ability to communicate with prisoners through its print publications remains otherwise intact. As Johnson County points out, since filing this suit, HRDC has sent publications without stickers or labels, and they were delivered.[5] Accordingly, this factor weighs in favor of Johnson County.

---

[4] HRDC also argues that its publications serve various penological interests. Doc. 5 at 11-12. But the issue is whether the mail policies serve a penological interest, not the comparative value of the publications.

[5] HRDC concedes that it has since been able to send magazines without mailing labels, but that it intends to resume sending other items at some point. Doc. 14 at 6. But it does not explain why it could not send those items without mailing labels. In support of its reply, HRDC submitted a supplemental declaration that states that only one of its offices has the capacity to print names and addresses directly on magazines, and that it intends to continue sending materials from the office that has to rely on labels. But it is not clear why this is the case. None of HRDC's briefing directly address this portion of the supplemental declaration. Regardless, the Court does not agree that a requirement that mail be sent without labels or stickers effectively curbs HRDC's ability to communicate with prisoners, even if that is how it prefers to operate.

The third *Turner* factor looks to whether and to what extent accommodating HRDC would impact guards, inmates, and prison resources. *Turner*, 482 U.S. at 90. HRDC argues that it would not burden Johnson County to accept its publications because numerous other prisons accept its publications "without censorship." Doc. 5 at 13. But this misstates the issue. Johnson County did not reject or censor HRDC's mailings because of their content. They were rejected, as relevant here, because they had stickers or labels on them. Although the practices of other prisons may be relevant in certain circumstances, *see Jacklovich*, 392 F.3d at 432 ("Also relevant, other institutions apparently permit receipt of gift publications . . . . Though certainly not dispositive, these policies may be considered."); *but see Heard v. Chavez*, 699 F. App'x 788, 792 (10th Cir. 2017) ("For example, it is irrelevant whether a rejected publication . . . was accepted at a different facility, or was accepted previously at the same facility."), the comparisons are less helpful when it is unclear whether other prisons have or are applying similar policies like the ones at issue in this case.

The proper focus of the third *Turner* factor is what impact it would have on inmates, guards, and prison officials at the Johnson County facilities if Johnson County was required to forgo its sticker/label policy altogether or at least for publishers as HRDC suggests. Johnson County argues that it would cost considerably more in staff hours to remove stickers and labels from mail, instead of just returning those items. Although HRDC asserts that officials "would not spend much time in removing mailing labels" like they do stamps, Doc. 14 at 6, it provides nothing to support this contention. Johnson County has also demonstrated that eliminating the ban on stickers or labels altogether, or even just for publishers, risks contraband entering the facility—something that would obviously negatively impact inmates and guards. Accordingly, this factor weighs in favor of Johnson County.

The fourth *Turner* factor looks to whether there is an easy alterative to the regulation that would have de minimis impact on the penological interest. *Turner*, 482 U.S. at 90-91. The existence of an easy alternative may demonstrate that the prison regulation is an exaggerated response and is not reasonable. *Jones*, 503 F.3d at 1154. But it is not a "least restrictive alternative" test. *Id.* (internal citations and quotations omitted). The analysis of this factor is somewhat repetitive of the third factor because HRDC again argues that an easy alternative to the sticker/label policy is just to have the mail clerks cut labels from envelopes like they do stamps. But, as noted above, Johnson County disputes that this is a viable alternative because it would require more than de minimis effort since officials would have to take extra time to cut the labels off and then transcribe the removed address labels to facilitate delivery. Doc. 10 at 12; Doc. 11 at 4. For the same reasons discussed above, the Court finds this factor weighs in favor of Johnson County.

The *Turner* factors demonstrate that the sticker/label policy is reasonably related to a legitimate penological interest. Accordingly, the Court finds that HRDC has not demonstrated a substantial likelihood of success on its First Amendment challenge to the sticker/label policy.

### b. Package Pre-Approval Policy

Neither party squarely addresses the package pre-approval policy in the context of the *Turner* factors. HRDC's motion does not address the package pre-approval policy at all, and the response and reply briefs only provide cursory arguments as to some of the *Turner* elements. Considering the arguments the parties do provide, the Court finds HRDC has not demonstrated a strong showing of a substantial likelihood of success in its challenge of the package pre-approval policy.

Johnson County states that packages present a greater security concern because they have more places to hide contraband and that "requiring inmates to get preapproval for packages and

the contents gives the staff the opportunity to evaluate and address problematic items before they arrive at the facility and ensures it does not contain unsolicited materials the inmate has no interest in, a significant waste of resources." Doc. 10 at 9. For pre-approved packages, the processing is also more efficient because staff know what a package will contain and only must do a security inspection on arrival. *Id.* at 9-10.

HRDC contends this policy doesn't "actually help[] the Jail" because it just changes the timing of when packages are inspected and actually uses more resources because officials may have to pre-approve packages that never arrive. Doc. 14 at 5. But HRDC's conclusory statements are not sufficient to demonstrate its likelihood of success on its challenge to the package pre-approval policy. HRDC also argues that efficiency is not a valid penological interest. But courts have held to the contrary. *See Cox v. Denning*, 2014 WL 4843951, at *19 (D. Kan. 2014) (although questioning whether efficiency should be a legitimate penological interest, acknowledging that both the Tenth Circuit and "the weight of authority appears to recognize efficiency is a legitimate interest"); *see also Simpson*, 879 F.3d at 280 ("Therefore, we find that Cape Girardeau's policy is rationally related to the legitimate penological interest of an efficiently run institution.").

Based on the arguments presented, the Court concludes that HRDC has not demonstrated a strong showing of a substantial likelihood of success on its challenge to Johnson County's package pre-approval policy.

### 2. Due Process Claim

HRDC argues that the Due Process Clause of the Fourteenth Amendment requires a correctional institution to provide the sender of rejected mail with notice and an opportunity to challenge the censorship, which it claims Johnson County did not do. Doc. 5 at 16.

13

HRDC has not made a strong showing of a substantial likelihood of success on this claim. HRDC relies primarily on the Tenth Circuit decision in *Jacklovich*. The primary issue in *Jacklovich* was whether it was sufficient to only notify the prisoner when a publication was rejected, as opposed to also notifying the sender. *Jacklovich*, 392 F.3d at 433-34. The Tenth Circuit held that there are minimal due process requirements when a prison rejects a publication, including giving notice to the publisher. *See id.*

Although HRDC contends it was not given any notice that its mail was rejected or for what reason, it concedes that its mail was returned to it with various stamps, including that the mail was an unapproved or unauthorized packaged, or that it was refused because of labels or stickers. *See* Doc. 14 at 9-10. This belies the claim that HRDC didn't receive notice of why its mail was rejected.

To the extent HRDC contends that this was insufficient notice, or that Johnson County does not provide any way to appeal the rejection of mail, the Court remains unconvinced that HRDC has made a sufficiently strong showing of a likelihood of success on this claim. Johnson County points to a recent decision from the Western District of Arkansas addressing HRDC's challenge to a postcard-only policy at a jail in Arkansas. *See Human Rights Def. Ctr. v. Baxter Cnty., Ark.*, 360 F. Supp. 3d 870, 871 (W.D. Ark. 2019). That decision noted that cases addressing due-process rights in the prison mail context generally involved censorship because of the substance of the mail, or because it was a particular type of mail or from a particular sender, including like in *Jacklovich*. *Id.* at 878. Those rejections were distinct from "routine rejection of mail because it did not comply with a generally applicable, content-neutral policy that applies to all types of mailings, regardless of content and regardless of sender." *Id.* The court concluded that generally applicable, neutral policies were not likely subject to the same due-process requirements. *Id.* at 882; *see also Prison Legal News v. Livingston*, 683 F.3d 201, 223 (5th Cir. 2012) (noting

14

that subsequent denials of publications previously deemed improper "amount to the routine enforcement of a rule with general applicability" that "are non-individualized" and thus "it is not even clear that due process is implicated by such decisions"). Rather, the court applied the test in *Mathews v. Eldridge*, 424 U.S. 319 (1976),[6] and concluded that HRDC was entitled to notice that its mailings were rejected under a generally applicable, content-neutral policy, but that an opportunity to appeal the rejection was not required. *Human Rights Def. Ctr.*, 360 F. Supp. 3d at 882-83. *Id.* As to notice, the court noted that markings on returned mail would have put HRDC on notice of why its mail was not delivered. *Id.* at 884-85.[7]

The Court finds this analysis persuasive.[8] The sticker/label policy and package pre-approval policy at issue here appear to be the same type of "generally applicable, content neutral" policies. It is unlikely that mail would be wrongly rejected under these policies or that additional procedures would add much value, especially when compared against the added burden on prison officials. Prisons "must be permitted to pass rules of general application, even ones that limit prisoner rights, without subjecting such rules to repetitive challenges every time they are applied."

---

[6] The standard in *Mathews* considers:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335. In applying the *Mathews* test, the court in *Human Rights Defense Center* first concluded that HRDC did have a private interest in communicating with prisoners, but that it was not completely curtailed by the prison's postcard-only policy. Second, it found little risk of an erroneous decision because the policy was a clear-cut ban on any mail that was not postcards. Third, the court concluded there would be little added value in more extensive procedural safeguards. *Human Rights Def. Ctr.*, 360 F. Supp. 3d at 882-83.

[7] Certain "technical due process violation[s]" were found for mail returned stating only "Refused" or "Return to Sender Refused," because there was no notice as to the specific reason for the rejection. *Human Rights Def. Ctr.*, 360 F. Supp. 3d at 885. Although some of the mail in this case was marked "Refused," most was also marked with another reason, such as "Unauthorized Package Reason: Not Approved" or "No Labels, Stickers, Etc."

[8] *Human Rights Defense Center v. Baxter County, Arkansas* is currently on appeal to the Eighth Circuit.

15

*Livingston*, 683 F.3d at 223. Based on this, the Court is not convinced that HRDC has demonstrated it is substantially likely to succeed on its Due Process claim.

### B. Remaining Injunction Factors

HRDC's arguments on the remaining injunction factors (irreparable harm, balance of the equities, and the public interest) all flow from its claimed First Amendment violation. Specifically, it argues that it is suffering irreparable harm by having its First Amendment rights compromised, that any harm to Johnson County in enjoining its policies is minimal compared to HRDC's loss of constitutional rights, and that the public interest is served by an injunction because it will restore HRDC's constitutional right to send its publications to prisoners. Doc. 5 at 17-20; *see also* Doc. 14 at 2 n.1 (noting that the likelihood of success on the merits will often be the determinative factor where a party seeks a preliminary injunction based on a First Amendment violation).

Because the Court has found HRDC has not made a strong showing of a substantial likelihood of success on its substantive constitutional claims, its arguments on the remaining factors are not persuasive.

### IV. CONCLUSION

THE COURT THEREFORE ORDERS that Plaintiff's Motion for Preliminary Injunction (Doc. 5) is DENIED.[9]

IT IS SO ORDERED.

Dated: December 14, 2020              /s/ *Holly L. Teeter*
                                       HOLLY L. TEETER
                                       UNITED STATES DISTRICT JUDGE

---

[9] Because the Court denies the request for a preliminary injunction, it does not address whether the bond requirement should be waived for HRDC.